UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

-vs-

D-1   DEAN REYNOLDS,

           Defendant.
_____/

Hon. Robert H. Cleland

Criminal No. 16-20732

Sentencing Date: February 6, 2019

**SENTENCING MEMORANDUM OF THE UNITED STATES
AS TO DEFENDANT DEAN REYNOLDS**

The United States of America submits the following memorandum in connection with the sentencing of defendant Dean Reynolds on February 6, 2019.

**I.     Statutory Factors**

As the court is aware, Title 18, United States Code, Section 3553(a) requires the court to impose a sentence that is sufficient but not greater than necessary to comply with the purposes set forth in that section, based on the factors discussed below.

### A. The Nature and Circumstances of Reynolds' Crimes

The people of Clinton Township first placed their trust in Dean Reynolds in November 2004, when they elected him to the Board of Trustees. Reynolds was re-elected trustee in 2008, and again in 2012. As a trustee, Reynolds was anything but trustworthy. Rather than serving the people, Reynolds corruptly served himself, monetizing his elected position at every opportunity. He took bribes from trash contractor Chuck Rizzo, engineering contractor Paul Modi and towing contractor Gasper Fiore. Convicted of four separate pay-to-play conspiracies, Reynolds was always open for the business of bribery.

Sadly, the defendant blatantly traded his oath and the faith of his constituents for tens of thousands of dollars in cash. He took over $50,000 in cash from Rizzo, along with $50,000 in free legal services, in exchange for supporting Rizzo's trash contract. He took $15,000 in bribes from Paul Modi in connection with the Township's engineering contract. After Rizzo began cooperating, Reynolds took an additional $8,000 in FBI-funded bribes from Rizzo and the undercover FBI agent. And the defendant took $7,000 in cash from Gasper Fiore in exchange for promising to get the Township's towing contract put out for bid.

The defendant's corruption extended beyond his own bribery schemes. Reynolds gladly brokered bribes between Rizzo and New Haven trustee Brett Harris in connection with the New Haven trash contract.

The vast evidence of guilt introduced at trial, which included video and audio recordings of the defendant requesting and accepting bribe-after-bribe, was simply staggering. This was reflected in the fact that the jury reached a unanimous verdict of guilt on all 14 corruption charges after just one hour of deliberations.

### B.    History and Characteristics of the Defendant

While lacking prior criminal convictions, Reynolds has an established track record of shaking down people in Clinton Township, even apart from his 14 felony offenses of conviction. During the court-ordered wiretap of Reynolds' phone, Reynolds can be heard bragging to confidante Angelo Selva that the owner of a local restaurant provided Reynolds with a free fundraising event on August 18, 2015. The event included free food and alcohol. Reynolds said he suspected the event was worth $10,000. An FBI interview of the restaurant owner revealed that the owner did, indeed, provide the free event. The invoice for the event was for $3,000, but was never given to Reynolds. In one intercepted call between Reynolds and the restaurant owner, Reynolds told the business owner that

3

Reynolds was using his elected position to look out for the owner's business interests.

The investigation of Reynolds also revealed that he was extorting a particular Township contractor, using threats when he asked the contractor for things of value. According to the contractor, Reynolds would say, "I'll remember the people that don't help me," whenever Reynolds asked the contractor for something. Items of value that Reynolds extorted from the contractor included between $500-$1,000 in 2012 and $1,000 cash in the fall of 2016. Reynold also demanded that the contractor provide Reynolds with free VIP tickets to events at the Freedom Hill amphitheater, required the contractor to plow the snow on Reynolds' street and made him transport Reynolds' son's go-cart to and from a repair shop on multiple occasions. The contractor told the FBI that he acceded to Reynolds' demands because Reynolds had the power to hurt the contractor's business.

It seems Reynolds' sense of entitlement arose from an intoxication with his own perceived power as an elected official. A stark example of this appeared in an intercepted call between the defendant and his then-girlfriend on September 12, 2015. Reynolds' girlfriend had no luck returning a mattress to a Clinton Township-based furniture retailer. Reynolds told his girlfriend that he was going

to "have a little chat with the manager or owner."  Reynolds added that he would speak with the person from the store who regularly appeared before the Township Board.  Reynolds stated, "I'll be shocked if he [the store manager] doesn't wanna, you know, take care of this based on … he comes to the Board every…couple times a year.  I really don't think he wants me unhappy."  Reynolds added, "If he doesn't wanna make me happy, why should I make him happy?"

In addition to his track record of shakedowns, the defendant has displayed an astonishing level of denial and lack of acceptance of responsibility since his convictions.  Despite the fact that his crimes were literally displayed before his eyes and ears during the 6-day trial, Reynolds has persisted in disavowing all culpability.  His post-conviction comments in conversations from jail are, perhaps, the most telling.

In a conversation with his former mother-in-law in the fall of 2018, Reynolds had this to say about his convictions:

>   In-Law:    Well, based on choices you [Reynolds] made, it's the life you chose.  So I don't know how you thought you didn't do anything wrong…
>
>   Reynolds:  I, I didn't.
>
>   ***

> Reynolds: And believe what you want, but I am innocent. And I would hope the news report shows you that. That they're, they're just, they're making an example out of me and there's nothing I can do about it.

In another call in the fall of 2018, Reynolds told his teenage son that the reason he was arrested on the charges in this case was that he ran for Township Supervisor.

> Reynolds: Yeah, there's so many things I should've done different. I don't think I should've ran [sic] for Supervisor.
>
> Son: You don't?
>
> Reynolds: Well, if I would've ran [sic] for Trustee [rather than Supervisor] this probably – there's a lot of issues that probably wouldn't have happened. Well, Bob Cannon [Reynolds' opponent in the Supervisor election] said he was gonna ruin my life. Did you think it was coincidental that I got arrested [on this case] on absentee [ballot voting] day? I don't.

Later, in a gut-wrenching call with his son, Reynolds actually told his son that it is his son's mother's fault that Reynolds is in jail.

> Reynolds: …but the problem is my attorney told me it was, it was your mother that started this whole mess.
>
> \*\*\*
>
> Reynolds: So, she [son's mother] lied and said they were bribes when they were loans because she was mad and the problem is she couldn't go back on it because an affidavit is a true, true statement.

6

Finally, in yet another blame-others declaration, Reynolds told his son that Reynolds is the victim of a government vendetta.

> Reynolds: I mean, it's just, I don't get it. I really don't get it…They [the government] destroyed my life.
>
> Son: They sure did.
>
> Reynolds: And I think that's what they [the government] wanted to do. They destroyed my life, my family. That, that's not justice.

In sum, an examination of the defendant's history and characteristics paints a stark picture of a self-indulgent, self-entitled shakedown artist who corruptly used his public position for personal gain without the slightest tinge of remorse.

### C. Seriousness of Reynolds' Crimes, Promoting Respect for the <u>Law, Providing Just Punishment</u>

As an elected trustee of Clinton Township, Reynolds was eager to forego the trust of the electorate to jump into four separate bribery conspiracies. Simply put, he was more than happy to sell his office for money or use his public post to threaten Township contractors for private gain. And his criminal way of life was no momentary lapse of judgement. Reynolds was known by contractors, including some who testified or appeared on tape at trial, as a "shakedown artist." That was a moniker that Reynolds richly earned during his many years of bribery and extortion.

7

Reynolds' extensive criminal conduct was quite serious. Indeed, the fallout from Reynolds' corrupt conduct continues to this day. *See* 'Clinton Township may cancel 'tainted' trash-hauling contract," *Macomb Daily* (January 13, 2019). https://www.macombdaily.com/news/copscourts/clinton-township-may-cancel-tainted-trash-hauling-contract/article_27e3b558-1785-11e9-bae7-bb4f8559bead.html Therefore, a very substantial prison sentence is necessary to reflect the seriousness of Reynolds' crimes, to provide just punishment for those crimes and to promote respect for the law.

### D. Providing Adequate Deterrence

The government's wide-ranging investigation of Macomb County has made it abundantly clear that there existed a culture of corruption and pay-to-play government in multiple municipalities there. However, the breadth of Reynolds' corruption dwarfs that of the other public officials prosecuted, including New Haven Trustees Brett Harris and Christopher Craigmiles, Chesterfield Supervisor Michael Lovelock and Macomb Township Trustee Clifford Freitas. A less-than-severe sentence for Reynolds, a prolific yet unrepentant bribe-smith, would greatly undermine the deterrent effect of the government's corruption investigation for those public officials tempted to sell their office at every turn like Reynolds.

8

### E.   Protection of the Public from Further Crimes of the Defendant

Since his 14 felony convictions last June, Reynolds has made it clear that he remains at least a potential threat to commit further corruption offenses.  In a jail call from Milan on December 10, 2018, Reynolds had this conversation:

Reynolds:   It's gonna take a year or two until I get out of this mess…

\*\*\*

Son:   Could you run- you could run for politics again, right?

Reynolds:   Yeah, if I win my appeal and get found- everything's either dropped or innocent or whatever.  I could do whatever I want again, like it never happened.

Son:   Would you…would you run for Supervisor [of Clinton Township] again?

Reynolds:   I don't know.  We have to sit down and talk about it as a family.

Even if Reynolds were unsuccessful in regaining an elected post, Reynolds has a history of committing corruption offenses without holding public office. During the course of the covert investigation, Reynolds explained to Chuck Rizzo that Reynolds' former company, Universal Training Center, held a training contract with the UAW that required Reynolds to pay approximately $100,000 in kickbacks to UAW officials each year.  At the request of the FBI, Rizzo explored whether or not Reynolds could get back into the corrupt kickback/training business

9

with the UAW. On March 20, 2016, in a recorded conversation, Reynolds agreed to try to regain his training contracts with the UAW and include Rizzo as a silent partner who would provide funding. Reynolds explained that in the past, Reynolds was grossing up to $3.4 million per year on the UAW training contract, but that Reynolds had to pay about $100,000 "out of pocket" in kickbacks to officials of the UAW. Reynolds told Rizzo he would need about $1,000 to pay UAW officials to open discussions about regaining the training contracts.

F. **Kinds of Sentences Contemplated by the Sentencing Guidelines**

The government concurs with the factual findings and guidelines calculations contained in the Presentence Investigation Report (PSIR), with one exception. Reynolds deserves two points for obstruction of justice under U.S.S.G. § 3C1.1. The Court heard Angelo Selva testify credibly at trial that, following the defendant's arrest for bribery on a criminal complaint, the defendant directed Selva to destroy a sham promissory note and all other evidence that would point to his guilt. Reynolds also asked Selva to remove electronic files on the computer at the defendant's training center. (T.T.; 6/14/18; pp. 62-63). Guideline Section 3C1.1, Application Note 4, specifically lists this type of conduct as that which triggers the application of the two-point enhancement. Application note 4 gives specific examples of what constitutes "covered conduct." The note states, "destroying or

concealing **or directing** or procuring **another person to destroy or conceal evidence** that is material to an official investigation or judicial proceeding" is covered conduct. U.S.S.G. § 3C1.1, Application Note 4 (D) (emphasis added). Fortunately, Selva did not follow the defendant's direction to destroy the false promissory note. Instead, Selva turned it over to the FBI, and it was an important government exhibit at the defendant's trial. (Trial Ex. 234).

With the additional two points for obstruction of justice, Reynolds' total offense level is 38. With a Criminal History Category I, his guideline range is 235-293 months.

### G. Avoiding Sentencing Disparities Among Similarly Situated Defendants

Section 3553(a)(6) instructs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." That subsection "is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct." *United States v. Benson*, 591 F.3d 491, 505 (6th Cir. 2010). A court's careful review of the guideline range "necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007). And indeed, one of the

11

"central reasons" for adopting the sentencing guidelines in the first place "was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Peppel*, 707 F.3d 627, 638-39 (6th Cir. 2013).

That national consensus for stiffer white-collar penalties has intensified in public corruption cases. In November 2004, the Sentencing Commission even amended the guidelines to increase the punishment for corrupt public officials. The Commission explained that "public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses," especially when compared with other white-collar crimes. USSG, App'x C, Vol. III, at 82 (Amendment 666). The Commission thus increased the base offense level for public officials because "offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them, and their offenses present a somewhat greater threat to the integrity of governmental process." *Id.*

Since then, federal courts have increasingly handed out substantial sentences in public corruption cases. For example:

- **Kwame M. Kilpatrick**, No. 10-CR-20403 (E.D. Mich.). In 2013, former Detroit Mayor Kwame Kilpatrick was convicted of 24 counts, including racketeering conspiracy, bribery, extortion, mail and wire fraud and filing false tax returns. Kilpatrick was sentenced to 28 years imprisonment.

- **James C. Dimora and Frank P. Russo**, Nos. 10-CR-387 and 10-CR-384 (N.D. Ohio). In 2011, former Cuyahoga County Commissioner Jimmy Dimora was convicted of racketeering and bribery-related crimes for accepting items of value in return for helping contractors obtain county contracts, grants, and loans, and helping others secure county employment and salary raises. He was sentenced to 336 months (28 years) in prison based on his receipt of $451,000 in personal benefits. In a related case, former Cuyahoga County Auditor Frank Russo—who pleaded guilty to accepting more than $1 million in return for $21.4 million in county real estate appraisal contracts, as well as other bribery schemes involving jobs and salary increases—received a prison sentence of 262 months (almost 22 years).

- **Mark Ciavarella and Michael Conahan**, No. 09-CR-00272 (M.D. Pa.), *aff'd*, *United States v. Ciavarella,* 716 F.3d 705 (3d Cir. 2013). In 2009, Ciavarella and Conahan, both judges with the Luzerne County Court of Common Pleas, were charged with racketeering for accepting a total of $2.8 million from the owners of several juvenile detention centers in return for the judges' support in the construction and operation of the facilities, as well as for the judges' failure to disclose their conflicts of interest when placing juvenile offenders at the facilities. Ciaveralla was convicted at trial and sentenced to 336 months (28 years) in prison. Conahan pleaded guilty and was sentenced to 210 months (17.5 years) in prison.

- **Jon Woods,** No. 17-CR-50010 (W.D. Ark.). In 2018, Woods, an Arkansas state senator, was convicted of 15 felony charges relating to taking kickbacks in exchange for steering state money to a private Christian college. Woods was sentenced to 18 years imprisonment.

- **Donald W. Hill**, No. 3-07-CR-289-M (N.D. Tex.), *aff'd*, *United States v. Reagan, et al.,* 725 F.3d 471 (5th Cir. 2013). In 2009, Hill, a

13

Dallas City Councilman, was convicted of bribery and extortion for helping provide public financing, zoning clearance, and political support to affordable housing developers in exchange for the developers' employment of Hill's associates and appointees as consultants. The evidence at sentencing showed that Hill's associates received about $270,000 in fees and other benefits through the scheme, and that losses totaled about $4.8 million, but there was little if any evidence that Hill himself received money from the scheme. Despite his lack of personal enrichment, Hill was sentenced to 216 months (18 years) in prison.

- **Jonathan Bolar**, No. 09-CR-00138 (E.D. La.), *aff'd*, *United States v. Bolar,* No. 10-30879, 483 Fed. Appx. 876, 2012 WL 1994728 (5th Cir. 2012). In 2010, Bolar, a Gretna, Louisiana city councilman, was convicted of extortion for pressuring people to hire his construction firm or give him campaign donations in return for his support in various land-use matters. Although Bolar extorted a total of only $122,000, the trial court applied an upward variance from the guideline range of 121-151 months because of Bolar's "pervasive extortion," as well as his obstructive conduct. The resulting 204-month (17 year) prison sentence was affirmed by the Fifth Circuit.

- **Larry P. Langford**, No. 08-CR-00245 (N.D. Ala.), *aff'd*, *United States v. Langford,* 647 F.3d 1309 (11th Cir. 2011). Langford, the president of the Jefferson County Commission and later the mayor of Birmingham, Alabama, was convicted in 2009 of accepting bribes for steering county bond work to an investment banking firm in exchange for $240,000 in cash, clothing, and jewelry. Langford was sentenced to 180 months (15 years) in prison based on a net benefit to the investment banking firm of $5.5 million.

- **Rod R. Blagojevich**, No. 08-CR-888-1 (N.D. Ill.). Blagojevich, the former governor of Illinois, was found guilty of a bribery and extortion conspiracy for attempting to trade an appointment to the U.S. Senate and state funding for a hospital and a horse race track, in exchange for $1.6 million in campaign contributions or a private sector job for him. Only one of Blagojevich's extortion attempts actually succeeded, resulting in $25,000 in campaign contributions. In 2011, he was sentenced to 168 months (14 years) in prison.

Although there are no identical comparisons, Reynolds' crimes most closely compare to Arkansas state senator Woods (18-year sentence), Dallas city councilmember Hill (18-year sentence), and Louisiana city councilmember Bolar (17-year sentence). Reynolds' bribery schemes were more expansive than those of the other defendants in that they involved four separate bribery conspiracies with multiple contracts and municipalities. A sentence for Reynolds within the applicable guidelines would, therefore, be consistent with the nation's other comparable corruption cases.

15

## II. Conclusion

A sad, decade-plus chapter has ended for Clinton Township, one in which its trustee, Dean Reynolds, made bribery and extortion a cottage industry. Reynolds' multitude of crimes combined with his stupefying lack of remorse and acceptance of responsibility require a lengthy prison sentence. The people of Clinton Township and the State of Michigan deserve no less.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/R. MICHAEL BULLOTTA  s/DAVID A. GARDEY
Assistant United States Attorney  Assistant United States Attorney

Dated:  January 24, 2019

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2019, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Richard Korn
*Attorney for Dean Reynolds*

s/R. MICHAEL BULLOTTA
Assistant U. S. Attorney

Dated:  January 24, 2019