# MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

| | |
|---|---|
| **United States District Court** | District: Michigan - Eastern |
| Name: Dean Reynolds | Case No.: 2:16-cr-20732 |
| Place of Confinement: FCI Milan | Prisoner No.: 55063039 |

UNITED STATES OF AMERICA

v.

DEAN REYNOLDS

## MOTION

Defendant, Dean Joseph Reynolds, through counsel, for his Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence, says he is a person in custody subject to future custody under a judgment of this Honorable Court. Mr. Reynolds hereby respectfully asks this Honorable Court, fort the reasons set for the below, to:

A. Declare that the judgment violates the Constitution or laws of the United States;

B. Declare that the judgment or sentence is otherwise subject to collateral review; and

    C.  Grant all additional relief Mr. Reynolds requests hereinbelow at the conclusion and requested relief part of this Motion;

    D.  Grant all further relief incidental to, or as necessary fully to carry out, effectuate and enforce such orders and decrees.

Further, Mr. Reynolds says:

1.    (a) The name and location of the court that entered the judgment of conviction Mr. Reynolds is challenging is this Honorable Court, the United States District Court for the Eastern District of Michigan, Southern Division, Port Huron, Michigan. (b) The criminal case number is: 2:16-cr-20732.

2.    (a) The date of the judgment of conviction is February 12, 2019; (b) the dates of sentencing are: February 2, 2019, which was continued to February 9, 2019, which was, in turn, continued to February 12, 2019.

3.    The length of sentence is a total term of 204 months.

4.    The nature of the crime (all counts): (a) bribery concerning programs receiving federal funds under 18 U.S.C. § 666(a) - ten counts; (b) conspiracy under 18 U.S.C. § 371 to commit bribery concerning programs receiving federal funds under 18 U.S.C. § 666(a) - four counts; and c) obstruction of justice - one count.

5.  Mr. Reynolds's plea was not guilty.

6.  Mr. Reynolds had a jury trial.

7.  Mr. Reynolds did not testify at a pretrial hearing, trial, or post-trial hearing.

8.  Mr. Reynolds appealed from the judgment of conviction.

9.  Mr. Reynolds appealed to the (a) United States Court of Appeals for the Sixth Circuit; (b) Case No. 19-1146; (c) the result was an affirmance of the judgment of this Honorable Court; (d) the date of that result is May 7, 2020; (e) the heading of the opinion of the court of appeals affirming the judgment of this Honorable Court says: "NOT RECOMMENDED FOR PUBLICATION, File Name: 20a0258n.06" and has the following citations: 813 Fed. Appx. 185, 2020 U.S. App. LEXIS 14789, 2020 FED App. 0258N, and 2020 WL 2211755; (d) on appeal, Mr. Reynolds raised the following grounds:

(i) this Honorable Court miscalculated his United States Sentencing Guidelines (specifically, U.S.S.G. 2C1.1(b)(2)) range by erroneously overestimating the benefit realized by the company providing campaign funds to help Mr. Reynolds win the impending township supervisor election at an exceedingly and unreasonably high dollar value;

3

(ii) this Honorable Court erroneously enhanced the sentence for Mr. Reynolds's having willfully obstructed the administration of justice in asking another to destroy evidence solely on the basis of uncorroborated testimony of an unreliable and incredible witness;

(iii) this Honorable Court court erred in sentencing Mr. Reynolds to a total term of 204 months of imprisonment, rendering his sentence substantively unreasonable, inasmuch as the great severity of the sentence was grossly disproportionate to (over three times higher than the longest of) the terms of imprisonment to which this Honorable Court sentenced Mr. Reynolds's co-defendants (and a gross disparity nearly seven times higher than the national average federal sentence of similarly-situated defendants (i.e., those co-defendants of Mr. Reynolds having chosen to plead guilty of charges of bribery and conspiracy to commit bribery); and

(iv) this Honorable Court's sentencing decision was unfairly animated by a degree of passion nearing constitutional proportion. Mr. Reynolds endeavored to demonstrate this misfortune in two ways:

First, as noted above, the sentence this Honorable Court ordered for Mr. Reynolds was over three times greater than the longest of the sentences this Honorable Court imposed in the cases of Mr. Reynolds's more culpable co-

defendants. Second, while all of his co-defendants pled guilty, Mr. Reynolds pled not guilty. He has consistently and continuously maintained his innocence to this day. This Honorable Court's open expression of distaste for Mr. Reynolds's remorselessness on the record served only to corroborate and make even more apparent what was evident from the disparate and disproportionate sentencing pattern for this group of defendants.

Mr. Reynolds should not be punished for his sincerity. One should not, and cannot properly under the law, be forced to confess crimes he did not commit or feign remorse when having done nothing wrong. Certainly, his sincerity should not be repaid with an even harsher sentence because of it.[1] Even so, the district court held nothing back in accusing Mr. Reynolds of "astounding" remorselessness and a "nearly astounding level of denial." Mr. Reynolds had no real choice but to raise this on review.

The above recitation essentially summarizes all of the salient grounds Mr. Reynolds raised in his appeal.

---

[1]In such case, for Mr. Reynolds to make an insincere allocution statement he firmly believed untrue simply to persuade the district court of feigned remorse in hopes of judicial mercy and a softened sentence would be improper on principle, disrespectful to the court, and even itself violative of law. When faced with the loss of liberty, the average defendant might be expected to surrender to such a temptation, and speak falsely for the sake of lenient treatment and nothing more. Still, such play-acting should never be rewarded or even countenanced. On that same principle, it serves nothing, and does violence, to punish a defendant for being true to his own self so as to be false to no other.

Mr. Reynolds filed a petition for certiorari in the United States Supreme Court. (1) Docket No. 20-5976; (2) the United States Supreme Court denied the petition; (3) November 16, 2020; (4) 89 U.S.L.W. 3163; 141 S. Ct. 860; 208 L. Ed. 2d 430; 2020 U.S. LEXIS 5504; 2020 WL 6701223; (5) the salient grounds raised are essentially the same as those in the appeal, described above.

11.    Mr. Reynolds has previously filed no other motions, petitions, or applications concerning this judgment of conviction in any other court.

## GROUNDS FOR MOTION

The following is a statement of every ground on which Mr. Reynolds claims he is being held in violation of the Constitution or laws of the United States and of facts supporting each ground, all of which statements raise issues properly cognizable by this Honorable Court and entitle Mr. Reynolds to the relief he hereby requests under. 28 U.S.C. § 2255.

## GROUND ONE:

### SIXTH AMENDMENT
### RIGHT TO ASSISTANCE OF COUNSEL

A defendant may always raise an ineffective assistance of counsel claim in section 2255 proceedings, even though the defendant could have, but did not, raise

that claim on direct appeal. *Massaro v United States*, 538 U.S. 500 (2003); *Griffin v United States*, 330 F.3d 733, 736 (6th Cir. 2003).

The right to effective assistance of counsel is "the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *United States v Cronic*, 466 U.S. 648 (1984). "[I]f the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." *Id*. In the present case, the nature and extent of the errors were prejudicial in a way that rendered the proceedings fundamentally unfair.

### Statement of Salient Facts

In his prime as one of the most preeminent of politicos in Macomb County, Mr. Reynolds was best known for having a giant heart. His best known single attribute was that nothing made him happier than to do favors for others, any hour of the day, no matter how minor or major.[2] Further, he was known for his dogged determination in achieving results.

A trustworthy man committed to civic duty and a reliable work horse for all of his constituents was his pride and his reputation. A "can do" fellow to whom it

---

2 Mr. Reynolds appealed from the judgment of conviction and didn't raise this issue on direct appeal. This ground needs factual development, which is better suited to a post-conviction proceeding under 28 U.S.C. § 2255. Mr. Reynolds didn't raise this issue in any post-conviction motion, petition, or application and raises it herein for the first time as one of the grounds of the present motion under 28 U.S.C. § 2255.

would never occur for a moment that he could have ever been doing anything wronging in giving and taking favors – let alone a violation of a federal criminal law that had any reach over elected local government officials.

To comfort him now in his days and nights of solitude he has only the solace of knowing in his heart that he never intended to hurt a single person and never did hurt a single person. When his business was performing well, he was a stable family man with solid backing from many of the community leaders. But when things started getting rough, with a drastic downturn in his business and now a failing marriage he was trying desperately to hold together, Mr. Reynolds soon found himself with limited options to get back on his feet quickly.

For some reason, instead of that, people would rather gossip about a man who had fallen from such great heights financially that it had become time for him to resort to calling in his chits. But in that life, doing favors for others is nothing to be ashamed about. Nor is asking for return favors.

And it is not beyond reason to suggest it may be difficult to feel guilt when you have not hurt anyone, and when you realize it may not always be that easy to understand that lobbyists, political parties, special interest groups, and  others whose job it is to seek to influence of members of national, state, and local government, and who build Political Action Committees to amass huge amounts of

8

donations to do so, are applauded as the backbone of our American democratic republic. While a local councilwoman who takes pains to do a favor for a constituent who happened to give a handsome donation to his campaign is looking at doing 15 years in the local federal prison for is trouble.

That is important, because for a man like Mr. Reynolds, enmeshed in the local world of Clinton Township politics and local government management, administration, and policymaking, one is expected to help constituents and service-providers responsible for fulfilling township contract responsibilities, and there is no concern about actual or perceived conflicts of interests given the customs of this culture and the safeguards in place to check such excesses.

An important one of those safeguards was a formal written Clinton Township policy that provided it was mandatory that contracts be awarded to the lowest qualified bidder. Neither the Clinton Township board of trustees had any authority whatsoever to run afoul of that policy, which was subject to further safeguards of having to pass review of the Township attorney and the head of the subject matter committee having authority over that scope of work.

So for any knowledgeable contractor or potential contractor to suggest that any local politician's "vote could be bought: would be to lie, to be woefully naive,

or simply innocently wrong. In any case, there was no such thing. Nor could a local township official's "influence" be bought.

Board members were strongly enjoined from considering awarding contracts to other than the lowest qualified bidder. Among other things, doing so would subject the township to suit by any disappointed contractor who could demonstrate their company was the lowest qualified bidder who, because of the strictures of the policy designed to ensure fairness and minimize the total annual expenditures of the township, had what was tantamount to a vested interest in such new business, regardless of whether they believed they had connections inside of the circle of power that might give them an intangible advantage over their competitors.

Within the context of this culture and structure was Mr. Reynolds's mindset, always. For that reason, alone, he was incapable of forming the kind of evil intentions or motivations to do an act coming anywhere near implicating the so-called "Programs Receiving Federal Funds Corruption Law," that is, 18 U.S.C. § 666, of which, of course, Mr. Reynolds had no idea. Indeed it was not until he was arrested in this case that he was aware that there were federal anti-corruption laws governing township officials on top of state laws occupying that subject matter area.

10

That is not to say that some candidates for local public office would not overpromise things if elected. And some self-important officials seeking to pump up their own cachet in local circles most certainly would be known as claiming to have powers they, in fact, did not, or have access to those viewed as most influential. Certainly this is unethical, immoral, and just a bad practice to engage in on numerous levels.

But people are people, they may get overinflated egos and throw around, to curry favor, stories about what they can do for others when they, better than anyone, know that such is blatant exaggeration -- if not outright lies. This is a mistake. People make mistakes.  People can recover from their mistakes. They can correct them or figure out how to get them corrected. They can learn from them. Or they might not, and their mistakes turn into bad habits or worse.

So during this period of malaise for Mr. Reynolds, charged with the obligation to provide financial support for his wife, Tammy Rozgowski Reynolds, and their son, Nicholas, then 14 years old, as well as himself, of course.  But the stress worsens. Reynolds becomes forced to turn to his parents, other relatives, other friends to borrow money. He lengthens his list of possible lenders, and at the same time Chuck Rizzo is approaching him. Pretty soon, he falls farther and farther into debt with Chuck Rizzo, his relationship with Tammy hits rock bottom, and he

is now faced with having to file for divorce, just as his campaign for township supervisor is heating up, with Election Day of November 2016 coming faster and faster with each day.

On top of all of that, the FBI, learning serendipitously about Mr. Reynolds from their ongoing investigation into Chuck Rizzo's corporate skullduggery looting the coffers of Rizzo Environmental Services ("RES"), the majority interest in which Mr. Rizzo and his father had just cashed out, and his henchmen, Quintin Kamlanauskas and Derrick. Before too long, the FBI decides to see if they can start building a case against Mr. Reynolds. So, as soon as January 27, 2016, the FBI pressures Mr. Rizzo to "flip to our side" and begin working with the FBI to hatch and then carry out a sting operation, "Operation Gold Ring."

But they are not satisfied simply to use the data they have gathered on the Rizzo-Reynolds relationship. They are more concerned with bringing more of the locals within the ever-expanding web of "Operation Gold Ring." Apparently, the evidence they have on Mr. Reynolds since they began their clandestine recordings of his telephone conversations in the summer of 2015 is scant.

Whatever the FBI believes they have between Mr. Rizzo and Mr. Reynolds cannot be too much in their estimation, which stands to reason because together

Messrs. Rizzo and Reynolds have not done anything in violation law, at least not together, and at least not as to Mr. Reynolds.[3]

So, by February, 2016 (when the township renewed the Rizzo contract by a vote of 7-0, so there is nothing there to exploit, nothing they need or could even

---

[3]The FBI strained to make much out of the participation of Mr. Ramanauskus, but there is actually no overlap between him and Mr. Reynolds at all. Mr. Rizzo is telling Mr. Reynolds the monies he is lending him is coming out of his personal accounts, so Mr. Reynolds's only one piece of business at RES's office is to pick up the Rizzo cash loan that Mr. Rizzo told Mr. Reynolds to go there to pick up. To Mr. Reynolds's mind, this is a personal – personal loan – from Mr. Rizzo taking money *from* his own personal account to lend *to* Mr. Reynolds for him to deposit in his own personal count or use as he feels he must. The point is this has nothing to do with RES-Township business, and these two men are dealing with each other without either of those entities in mind. That is Mr. Reynolds's mind-set. Trying to get hold of his own personal borrowing needs (such as dealing with the divorce litigation expenses) out of whatever limited income he can manage to make.

Around his time, summer/fall of 2015, Mr. Reynolds always thought of this money from Mr. Rizzo, who constantly and consistently treat this arrangement as a line of credit – in their conversations Mr. Reynolds always taking pains specifically to itemize each cost item carefully and careful not to take the money until those anticipated expenses come due. There was never a quid pro quo arrangement whereby Mr. Rizzo would "pay to play," Nor was there ever a so-called "stream-of-benefits arrangement where Mr. Rizzo would keep the payments up periodically just in case he thought it might get him "special treatment" from Mr. Reynolds to cut through some township red tape, should such need arise – but such arrangement is not tied to any scheduled event and is usually moreso on an ad-hoc basis – again, really nothing more than a garden-variety scenario of friends doing favors for each other if and when the need may arise. There was never even date. The FBI also takes pains to write their story to include Mr. Hicks. That is likewise a stretch, since  all there is to the Hicks-Reynolds connection what that Mr. Hicks was, yet again, another part of the Chuck Rizzo "family" of players, whom Mr. Rizzo would sometimes send over to the Reynolds household to help Mr. Reynolds, and, occasionally, his son, Nicholas, with a home project. But, as even

use in favors from Mr. Reynolds). At he same time RES, which broke into Clinton Township in 2014, is now sitting pretty, happy with the status quo. RES was by that point fairly well vested with the township business for garbage collection – and would likely continue to be so for many years to come, with or without Mr. Reynolds's help.

Had Mr. Reynolds had the wherewithal to withdraw from Mr. Rizzo around this time – around the mid-fall of 2015, he would have escaped the trap that the FBI and Mr. Rizzo ended up setting for him in the winter of 2016. But Mr. Reynolds was still linked indirectly with Mr. Rizzo because Mr. Rizzo was letting Mr. Reynolds borrow the RES lawyer for his divorce litigation – so by this time he is not just Mr. Rizzo's lawyer, he is the lawyer for Mr. Reynolds, and, effectively the lawyer for them jointly on overlapping matters, inasmuch as Mr. Reynolds wants to continue getting Mr. Rizzo's friendly/brotherly counsel to help support him emotionally through a nightmare of a divorce proceeding, and Mr. Reynolds

---

Nicholas would attest, there was never a time that Mr. Reynolds did not make it worth Mr. Hicks's while – Mr. Reynolds would always reward Mr. Hicks for his work by providing meals not only to him but to all of his men on the job there anytime, money, various gifts, etc., so it was never the case that Mr., Reynolds was freeloading off of Mr. Hicks. Hicks in any way. Nor had Paulin Modi much to help the FBI with, if it was looking for evidence to make a criminal case against him. Again, Mr. Reynolds never knowingly did anything wrong. Nearly the totality of dealings between Mr. Modi and Mr. Reynolds happened in  i

wants Mr. Rizzo to know about every penny he is dealing with or will be dealing with of current an ongoing debt.

Complicating much of this aspect of Mr. Reynolds's life at this point is the so-called "fake promissory note" that Al Bianchi agreed could be made out to him in his name. The point of that exercise was not to conceal the lending relationship between Mr. Rizzo and Mr. Reynolds – it was simply to minimize the risk that Tammy might find out about these types of ties between Mr. Reynolds and Mr. Rizzo and that a swarm of publicity-seekers would emerge, which was not help Mr. Rizzo, given his deepening problems coming out of the large corporate corruption scandal, which was quickly coming out of RES, with the FBI, at the same time, quickly tightening their noose around Mr. Rizzo,

So the FBI knows it can make much more out of the promissory note by false or misleading innuendo, which was far greater than any real utility, Still, it was used in the divorce proceeding as what was only a pro forma matter only, of no consequence, because of no relevance to that divorce proceeding and certainly no connection to any understandings between Mr. Rizzo and Mr. Reynolds. In any case, a copy of the note eventually made its way to publicly-available files at the Macomob County Circuit Court, since it was a nullity, there was no reason to destroy – Mr. Bianchi was not going to come to try to collect.

The further misfortune of the promissory note sidetrack was that it focused the case a little on Mr. Reynolds' former employee, Angela Selvac. The problem with Mr. Selva is that he is and has been for the past several years, demented, and cannot be relied upon to give any useful, informative, or accurate information of any kind. The FBI seized in on this, charged him with misprision of felony for it, threatened him with getting prison time for it, and, thus, "flipping" Mr. Selva to "the feds' side."   Rizzo. So, most likely with much coaching from the Justice Department, Mr. Selva is now "encouraged" to recall a telephone call with Mr. Reynolds where Mr. Reynolds advice him to destroy the phony promissory note, which, of course, never happened.

Mr. Reynolds categorically denies ever having had any such discussion with Mr. Selva concerning any destruction or concealment of the phony promissory note or an,thing else. That the federal agents and attorneys are vigorously coaching Mr. Selva was readily apparent during Mr. Selva's confused testimony where the lawyer asks him how much he told Mr. Reynolds a good divorce lawyer would be, and Mr. Selva barks back at him, saying "I never t old you $70,000-$80,000 – *you toils me that*!"

In connection with all of this, Mr. Reynolds did have an important conversation with his divorce attorney, Jay Schwartz, in which Mr. Reynolds

16

specifically ached him whether there was anything legally wrong with the arrangement between Mr. Reynolds and Mr. Rizzo and the financial activity between them, which included Mr. Rizzo's having put Mr. Schwartz and Mr. Reynolds together into their own attorney-client relationship.

In response, Mr. Schwartz asked Mr. Reynolds back, "are you acting legitimately by keeping the arrangement on a personal level and keeping ERS and the Township strictly separate and beyond the reach of anything having to do with the arrangement, or are you taking the money to compensate yourself in return for the promise of your causing the Township to grant special benefits and preferential treatment to RES?" (or words to that effect). Certainly not having any such influence within the township, Mr. Reynolds told him its just a simple personal loan between two friends to be paid back, every penny. In reply, Mr. Schwartz then assured him, "well, then you've got nothing to worry about."

Unfortunately, armed with that advice and reassurance, Mr. Reynolds walked right into the Rizzo Lion's Den, and the four-way "sting operation" orchestrated by (now undercover FBI agent/informer) Mr. Rizzo, trying hard to pull in together in one or more combinations of meetings involving Mr. Reynolds, Mr. Fiore, Mr. Harris, and Marco (undercover FBI agent). (Discussed further, below).

Along the lines set out above is how Mr. Reynolds anticipates he would have or could have testified at trial in defense of the numerous conspiracy and bribery charges brought against him in this action.

Mr. Reynolds hired attorney Stephen T. Rabaut, criminald defense specialist, on a strong recommendation of a close friend, immediately upon his getting arrested and charged on the original indictment. Mr. Rabuat advised him he had a good, winnable, case, with many defenses. His only reservation with that was that it would not be automatic, "there will be some explaining to do," but, ultimately, Mr. Reynolds was not looking at the likelihood of a conviction or jail time.

While that provided some small relief to Mr. Reynolds just having been arrested, he was not particularly surprised with the news because, again, in his heart of hearts, the dealings between him and Mr. Rizzo, and even later when the whole gang of Messrs. Fiore, Harris, and Carlo entered the scene all of a sudden, Mr. Reynolds simply viewed this as in the final analysis a typical Chuck Rizzo deal and that, it it was okay with Chuck, then it was okay with him to go along to get along.." At no time during this period (February – April 2016) did Mr. Reynolds ever direct, guide, lead, or ever make any agreements with anyone about achieving any ends to that agreement or about the use of any means to carry out the

agreement to achieve its end. At all times, all of that was orchestrated by Mr. Rizzo and Mr. Rizzo, only, who, it turned out, was just play-acting, basically reading from a script written by FBI agents, being subject to their firm and control, with no way out, and having to do everything just exactly as they told him, in order to entrap Mr, Reynolds by pressuring and cajoling him into doing bad acts he most certainly was not predisposed to do.

Messrs. Reynolds and Rabaut had scant meetings during the pre-trial period. But Mr. Rabaut had sketched out a plan that he willingly shared with Mr. Reynolds. He first said they would need an expert witness on the cultures, sub-culture, mores, and psychology of party politics, partisan campaigns for public office, community relations, publicity, advertising, fund-raising, and the mechanics related thereto, to set the stage for how people in this sub-culture tend to inter-relate, communicate, and seek to develop complex, intricate relationships built most commonly around reciprocity, that is, valuing people and valuing y0ourself on what you can expect to contribute to or for the benefit of the other person or group and what you can expect them to contribute to you, your group, or cause, in return (in reciprocity). Important to include among the sub-topics to be treated would, of course, be how to deal with the tension between political speech (First

Amendment-protected), campaign solicitations and contributions, winning campaign promises and strategies, and anti-corruption and bribery laws.

Second, he said we will need an expert to testify in the area of local Clinton Township political and government management and customs, mores, cultures, sub-cultures, and ethics.

Beyond that, Mr. Reynolds gave him lists of exhibits that Mr. Reynolds believed would be effective in developing his factual disputes of the charges in the indictment and factual defenses to the charges. Still there was little, if any, discussion of legal theories Mr. Reynolds would have available to him and help to develop.

Of course, with the authorities going public with their indictment filed against Mr. Reynolds in October, 2016, essentially on the eve of the election (the "October Surprise," Mr. Reynolds lost to incumbent Bob Cannon in the Township Supervisor election. But even still, it was a close race, and Mr. Reynolds, a Democrat, had his campaign suffer a second blow in that the Donald Trump effect brought many to the polls of a staunchly partisan bent for even the local elections, primed to vote a straight Republican ticket "down ticket" from Mr. Trump, the Republican Presidential Candidate, who ended up winning Macomb County, a typically Democrat-majority voting locale.

Mr. Reynolds because preoccupied with ongoing financial problems now due to unanticipated legal defense expenses, his elderly mother was of quickly-deteriorating health, with her illness and necessities of special care now puttying additional significant stress and taking a large toll on the family. Beyond that, Mr. Reynolds was diagnosed with kidney cancer, was required to undergo kidney surgery which resulted in the removal of a portion of his kidney, and which surgery turned out ultimately to be unsuccessful, as his surgeons could neither confirm nor deny whether the surgery did or did not result in the removal of this grave threat to Mr. Reynolds's health and very life.

These distractions did not help with the trial preparation. But neither did Mr. Reynolds find Mr. Rabaut particularly engaged or enthused about the case as the trial date was nearing. There was little preparation, neither of the two expert witnesses ever emerged, and Mr. Abut deems uninterested in putting on a defense case with a robust set of documentary evidence and witnesses who would corroborate the evidence that he could personally give from my recollections and records of the many communications and dealings with the various people wrongfully listed along with me  in a collections of conspiracies sere out in the superseding indictment.

While so preoccupied, Mr. Rabaut put to Mr. Reynolds the option of taking a plea agreement. Up until then, because he was always convinced of his own innocence, Mr. Reynolds had never been open to considering accepting responsibility for committing crimes he did not in fact commit and for which, he was not, in fact, responsible as a pure matter of principle, in addition to having no desire to suffering a loss of liberty by imprisonment, as no one, or course, would.

At this point, however, Mr. Rabaut was receptive of the idea of accepting a plea offer. Mr. Reynolds asked Mr. Rabaut what had happened that should make them reconsider their joint position against accepting a guilty plea proposal, so staunchly held by them since the very first day Mr. Reynolds retained Mr. Rabaut.

Mr. Rabaut was unable to articulate anything new that would cause a reevaluation, although he seemed to have concerns about the strength with which he had seen of the prosecution's case coming together against Mr. Reynolds. So Mr. Reynolds responded that he has not yet been presented with enough information, legal guidance and advice, and all other rationale available to aid him in reconsidering his position against agreeing to a plea, so he could not move forward to reconsider that.

To make matters worse, Mr. Reynolds ran out of money necessary to take care of Mr. Rabat's fee to prepare for and conduct the trial. Mr. Rabaut was,

however, amenable to asking for the Court's appointment of him as indigent counsel, still proceeding as Mr. Reynolds's counsel, but having agreed under the circumstances to accept compensation at a much lower amount than he would have earned under our private retainer agreement relationship.

Mr. Reynolds believed that if Mr. Rabaut was unprepared for trial thee was a good chance the Court would have granted an adjournment so they would have more time to prepare together, but Mr. Rabaut never sought an adjournment and proceeded with Mr. Reynolds to begin the trial as scheduled in June, 2018.

Mr. Reynolds's concern by this late stage was that Mr. Rabaut had seemed to have outlined a good plan to develop the defense of the case and ultimately develop it, with the expert witnesses and some themes or theories of the case to build. Si it was not that Mr. Reynolds ever disagreed with Mr. Rabat's trial strategies, to the extent he shared those with Mr. Reynolds. The problem for Mr. Reynolds, at least from his untutored perspective, was that lit did not seem that Mr. Rabuat had actually even acted on, implemented, and was now ready to put forth those trial strategies. He had no evidence to put on in support of evidence at trial – not a single witness, and not a single exhibit.

Finally, Mr. Rabaut was no longer non-commital on whether Mr. Reynolds should testify at the trial on his own behalf. By now, the start of the trial was either

imminent or had already begun and was in its preliminary state. Yet Mr. Rabaut, if he were planning on calling me as a witness, never said a thing about it to Mr. Reynolds or gave him any sign one way or the other, and took no action whatsoever to prepare Mr. Reynolds for his testimony and how best to have Mr. Reynolds be prepared to meet the cross-examination of the prosecution. It was not until the penultimate date of the trial that Mr. Rabaut told Mr. Reynolds it was his experience that about 90-95% of those defendants testifying on their behalf at criminal trials lose their cases. But he said little if anything to Mr. Reynolds any further on the topic. Mr. Reynolds lacked the information to make a meaningful choice. He also felt he lacked the intellectual wherewithal at that point to formulate any further meaningful questions.

With much of the evidence the government put on at the trial being audio recordings of my own voice in conversations with people like Mr. Rizzo and Mr. Selva, and with the FBI agent testifying about his own inferences of the meaning of the conversations and the states of minds of the participants, much of which was tendentious, incorrect, diametrically opposite of the truth, and in need of correction and clarification, it seemed to Mr. Reynolds he would be the only "evidence" in existence able to meet the government's evidence.

Further, during the prosecution's case-in-chief, Mr. Reynolds would point out the importance of certain evidence, such as certain exhibits or inconsistent testimony. At times he would put a piece of paper in Mr. Rabaut's hand, asking him either to use it in the trial or to explain to him so he knows why not. Such communications weld often fall on deaf ears, with Mr. Rabuat simply never responding to Mr. Reynolds's overture.

Still, when the government rested and it was time to put on Mr. Reynolds's defense case, Mr. Rabuat chose to call no witnesses, proceeded not to have me testify, and not to offer any documentary or other evidence whatsoever. The jury heard hours of testimony designed to put Mr. Reynolds unfairly in a bad light, the most curious of which was the testimony of Mr. Selva who described the circumstances surrounding the fake promissory note and offered other speculative testimony on his understandings, interpretations, and extrapolations from audio recorded conversations with Mr. Reynolds. All of that could have been easily rebutted by Mr. Reynolds, like he could likely have rebutted so much.else of the prosecution's case, as it was substantially the prosecution's use of Mr. Reynolds's own words against him upon which they had to rely to make out their prim face cases.

Without hearing Mr. Reynolds's testimony describing his own state of mind, at the very least, the jury was left with hearing only the government's case. So while there were two sides of the courtroom occupied by two sets of human beings, one on the left side oi the courtroom representing one side of the case, and the other at the right side of the courtroom representing the other side of the case. In reality, though, there was only one side of the case articulated at trial, thee jury heard only one side of the case, and, thus, were effectively left with no real opportunity to decide conflicts or choose from competing evidence or versions from two opposing sides, which is the essence and necessity of our very adversary system.

So what the jury was essentially faced with was a simple, acting not much differently than a referee of a soccer game who declares the team present with the minimum players to take the filed the winners by forfeit over the opposing team, who were a no-show. Nor can this Honorable Court be fairly faulted for arriving at conclusions unfavorable to Mr. Reynolds from the evidence adduced because, again, this Honorable Court was simply never provided with the opportunity to hear the defense's evidence.

Shortly after the jury returned the verdict, Mr. Rabaut abruptly, and with no discussion about it with, or even notice to, Mr. Reynolds, moved to withdraw as

Mr. Reynolds's counsel on the basis that there was as breakdown in the attorney-client relationship.[4]

*N.B.* All of the below "Undergrounds" to Ground One derive from and are intrinsically within the doctrinal analysis under the Sixth Amendment of ineffective assistance of counsel; still some of which may have their own independent doctrinal underpinnings either from the text of the constitution itself or from decision constitutional law. Below is not intended to be a complete or exhaustive list or set of citations to the controlling or most appropriate legal authority. Mr. Reynolds hereby reserves the right to file a Memorandum of Law in support of this motion or the right to seek leave of this Honorable Court to do so.

## Sub-ground A

## Right of Defendant to Testify (Fifth and Sixth Amendments)

The right to testify on one's own behalf is a constitutional one. *Rock v Arkansas*, 483 U.S. 44, 52  (1987).

> Logically included in the accuser's right to call witnesses whose testimony is "material and favorable to his defense," *United States* **v**. *Valenzuela-Vernal*, 458 U.S. 858, 867 (1982), is a right to testify himself, should he decide it is in his favor to do so. *In fact, the most*

---

4 *See supra* footnote 2.

> *important witness for the defense in many criminal cases*
> *is the defendant himself*

*Id.* (emphasis added),

> The importance of testimony to the government's case is often matched by the need for the defense to call witnesses to explain that no intent to corrupt the exercise of government authority existed. An important feature of the defense case will be to call into question those individuals who provided information to the government, showing that they misunderstood the interaction or, perhaps worse, fabricated their testimony to avoid responsibility. *Frequently, the best witness is the defendant, but putting him on the witness stand is always a risky proposition even if it is almost a necessity in public corruption prosecution.* Especially when the defendant is an elected official, there is enormous pressure for the person to testify and explain how there was no corrupt motive, even where the transaction has the aura of impropriety. *A failure to take the witness stand by a person whose political career involves taking – and explaining – public positions could be viewed as tantamount to an admission of the crime.* Moreover, most positions believe that if given the chance to explain themselves, they can convince a jury of their innocence. Under the professional responsibility rules, the client, not the lawyer, decides whether to testify, and the lure of the witness stand (and perhaps one last performance) can be overwhelming.

Henning, Peter J., *The Prosecution and Defense of Public Corruption, The Law and Legal Strategies* (2020)(emphasis added footnote omitted) at 15-11.

In the case of defendant's autonomy securer  by the Sixth Amendment, that is, where the decision in question is reserved for the client and the client, alone,

any shortcoming in counsel's performance in assisting the defendant in making that decision interferes with the client's ability intelligently to appreciate and knowingly make the decision whether to exercise or waive such important right, or where the attorney's performance infringes on the defendant's autonomy, assistance of counsel is per se deficient and, thus, a constitutional violation. *Garza v Idaho*, 139 S.Ct. 738, 745-46 (2012).

Where counsel does not perform to the level ecessary to assist the defendant-client in making decisions reserved for the client, assistance of counsel is per se deficient and, thus, a constitutional violation. *Garza, suora; Missouri v Frye*, 566 U.S. 134, 145 (2012); *Padilla v Kentucky*, 559 U.S. 356, 368-69 (2010); *Roe v Flores-Ortega*, 528 U.S. 470, 477-80 (2000).

It was ultimately Mr. Reynolds's' decision whether to be the sole witness to give testimony on his own behalf at this criminal trial. *McCoy v. Louisiana*, 138 S.Ct. 1500, 1508-09 (2018); *Jones v Barnes*, 463 U.S. 745, 751 (1983). Mr. Rabaut did not do what was necessary to assist Mr. Reynolds. This constitutional violation requires this Honorable Court to vacate the judgment of conviction and the sentence. [5]

_____

5 *Id.*

**Sub-ground B**

**Right of Defendant to Call Witnesses (Sixth Amendment)**

Mr. Rabut called no witnesses. As set forth herein, Mr. Reynolds had a number of valid defenses to bribery and conspiracy, and his own testimonmy, especially with corroboration of other parties to such interactions or at least kknowledgable of important matters surrounding such interactions, could most certainly have been called to verify Mr. Reynolds was acting with purity of heart. For direction on the importance of witnesses in cases such as this, and likely areas if examination from which to draw supportrive testimonay that will likely be needed, see *The Prosecution and Defense of Public Corruption, The Law and Legal Strategies, supra,* at 15-11.

This demonstrates another incident of fundamentally and profoundly ineffective assistance of counsel.[6]

**Sub-ground C**

**Right to Campaign for Public Office (First Amendment)**

The First Amendment affords political speech the highest degree of protection available under constitutional law, and that protection extends to verbal and non-verbal speech alike, including the expressive speech of contributions to political candidates and officials, campaigning, campaign fund-raising, and

---

6 *Id.*

30

political association. *Buckley v Valeo*, 424 U.S. 1 (1976); *McCutcheon v FEC*, 134 S.Ct. 1434 (2014); *Shickel v Dilger*, 925 F.3d 858, 869 (6th Cir. 2019);   *United States v Menendez*, 132  F. Supp. 3d 635 (D. N.J. 2015).

The making of gifts to public officials in exchange for influence does not constitute quid pro quo corruption. The charges and jury instructions were overbroad and captured lawful conduct. *See, e.g.*, court of appeals opinion at p 9 ("[T]he government introduced evidence at trial that Reynolds and Chuck Rizzo discussed the opt-out clause and that Reynolds offered to 'get rid of that provision' if Chuck Rizzo helped get him elected as Township Supervisor by providing campaign funds").

The record is replete with evidence of and references to Mr. Rizzo's being a contributor to committees to elect Mr. Reynolds not tied to any RES bueiness whatsoever, And, again, what *de mimimis* dealiings Mr. Reynolds ever had communicating with Gaspar Fiore were centered only around how Mr. Fiore help support Mr. Reynolds's township supervisor campaign. As to a significant part of the charges, then, Mr. Reynolds should have had a valid First Amendment political speech defense.

31

If the requested relief is not granted this Honorable Court would, in effect, be interpreting and applying sections 666 and 371 so as to render them unconstitutional as violative of the First Amendment as applied.

This demonstrates another incident of fundamentally and profoundly ineffective assistance of counsel.[7]

### Sub-ground D

### The Tenth Superseding Indictment With the Four New Conspiracy Counts Should Have Been Dismissed for Prosecutorial Vindictiveness (Fifth Amendment)

The Government brought the Tenth Superseding Indictment in direct response to Mr. Reynolds's decision not to make a plea agreement, in exercise to his right to a jury trial. The Due Process clause limits prosecutorial discretion in seeking to punish a defendant for exercising a constitutional right.

Under the circumstances of this case, the government never should have been permitted to increase the charges against Mr. Reynolds solely to punish and retaliate against him for not accepting the government's plea offer. The Government had a high stake in deterring the exerise of his rights, and the conduct of the prosecuors was so extreme as to be properly classified as objectively unreasonable when this case is reviewed on the totality of the circumnstance.

---

7 *Id.*

There is no other valid explanation. The four new counts of conspiracy in the Tenth Superseding Indictment against Mr. Reynolds in this case were based on exactly the same underlying conduct as the original indictment was. The Government cannot reasonably argue that its case changed significantly between the first and the tenth superseding indictments, given that the government already possessed all of the relevant evidence that supported the superseding indictment long before the first indictment. *United States v LaDeau,* 734 F. 3d 561 (6th Cir. 2013)("*Blackledge* rule is a prophyactic one; it safeguards a defendant's due process rights by eliminating apprehension of prosecutorial retaliation where circumstances reaonably indicate retaliation, even if ther is no direct evidence that the prosecutor was in fact properly motivated"); *United States v Poole*, 407 F.3d 767, 774 (6th Cir. 2005).

Section 2255 relief is appropriate to redress ineffective assistance in failing to challenge indictment as muliplicitous. *United States v Jones*, 403 F.3d 604 (8yh Cir. 2005).

This demonstrates another incident of fundamentally and profoundly ineffective assistance of counsel.[8]

_____

8  *Id.*

33

## Sub-ground E

## Multiplicitous Tenth Superseding Indictment

A multiplicitous indictment arises when a single conspiracy is charged as more than one count. *Blockburger v United States*, 284 U.S. 299, 304 ( 1932); *see also Costo v United States*, 904 F.2d 344 (6th Cir. 1990)(double jeopardy where defendant sentenced on two counts as part of same transaction).

Conviction and sentencing on more than one count alleged in a mulplicitous indictment violates the Double Jeopardy Clause of the Fifth Amendment because the conspiracy is only one offense and reuires only one set of facts to be proven. *Ball v United States*, 470 U.S.856, 860-62, 860 n.8 (1985).

At most, there was one bribery/conspiracy between Mr. Reynolds and Mr. Rizzo, never alleged to be of the "quid pro quo" kind,  but moreso like the "stream of benefits kinds not specifically identifiable to any particular act or event and any fixed time.  In the present case, the Tenth Superseding Indictment alleges such a conspiracy spanning the period March 2014 through January, 2016. The Superseding Indictment alleges 12 involving Mr. Rizzo. Consequently, it should have alleged only 2. Additionally, there are two more counts alleged as to dealings between Messrs. Reynolds and Modi. Thus, there should be a maximum of four counts, total.

This demonstrates another incident of fundamentally and profoundly ineffective assistance of counsel.[9]

### Sub-ground F

### The Government's Addition of the Conspiracy Charges Violates Wharton's Rule and the Prohibition Against Double Jeopardy

An agreement by two people to commit a particular criminal act cannot be prosecuted as a conspiracy if the commission of the crime itself requires to the participation of two people  This is knoiwn as Wharton's Rule, the design of which was tgo elimiate the danger of defendants redceiving dukal punishment for the same crime. *United States v Wright,* 506 F.3d 1293, 1299 n.4 (10th Cir. 2007).

All bribery counts in the Tenth Sperseding Indictment should have been challenged at the threshhold and summarily dismissed.under Wharton's Rule.

This demonstrates another incident of fundamentally and profoundly ineffective assistance of counsel.[10]

### Subground G

### Entrapment (Fifth Amendment)

The government's conduct from the time co-conspirator Charles Rizzo became and government agent and informant in January, 2016 and thereafter,

---

9 *Id.*

10 *Id.*

unquestionably was the sole inducement to any alleged wrongdoing of which Mrl Reynolds was accused from that day forward. This is classic entrapment.

The government, through its agent Mr. Rizzo and, later, through its second agent, Carlo, were the sole proximate cause of any conspiracy or bribery involving Gaspar Fiore and Brett Harris. These agents did not simply create an environment for Mr. Reynolds to commit crimes in March, 2016, they cajoled him. They were the cause of the unlawful acts, merely using Mr. Reynolds as an innocent instrumentality as they had him go through the motions to help them in their attempts to set up and sting Mr. Fiore and Mr. Harris, and catch Mr. Reynolds in this web, to book.

The record in this case establishes the Government conceived, orchestrated, and then remained involved in certain undercover investigations that either created opportunities for Mr. Reynolds to commit one or more of the charged crimes or created an environment for illicit transactions. At the same time, at no time was Mr. Reynolds ever predisposed to commit any crimes concerning Mr. Fiore and Mr. Harris.

In fact, Mr. Reynolds always understood that Mr. Fiore was not ultimately interested in pursuing a bid for any township towing contract work. His towing

company was not qualified to bid because his company owned no lots in the township, which was a condition of being awarded the towing contract.

And Mr. Reynolds was always expecting the loan advances that Mr. Rizzo promised him would come during this period would come out of Mr. Rizzo's personal pocket, and as far as Mr. Reynolds was concerned or understood, they did. Mr. Fiore insisted that any money to Mr. Reynolds come from Mr. Rizzo. So, if Mr. Rizzo had to turn to Mr. Fiore to put together all of the money he needed to give to Mr. Reynolds, that had no effect on Mr.. Reynolds's state of mind. Further, Mr. Reynolds, after just one meeting with Mr. Reynolds withdrew himself and his company from any further dealings. Shortly after that meeting he sent a text message to Mr. Reynolds saying he had no interest in township work and would participate to discussion on thetopic of thetownship.

From Mr. Harris, all Mr. Rizzo told Mr, Reynolds he wanted was a little help discrediting his rival, Waste Management. He wanted the opportunity to get from Mr. Harris some letters criticizing the job that Waste Management had been doing in New Haven Township. In return, as far as Mr. Reynolds ever knew, all Mr. Harris wanted or ever asked for from Mr. Rizzo was a modest donation to one of New Haven's "movie night" community social outings the township sponsored.

If Mr. Rizzo or Carlo ever made a payment to Mr. Reynolds above and beyond that, Mr. Reynolds never knew about it. Nor did he ever even know of any such plan to give to Mr. Harris anything more than the "movie night" donation for the good of the community.

This demonstrates another incident of fundamentally and profoundly ineffective assistance of counsel.[11]

## Subground H

## Limitations

The government alleged and presented proofs that the bribery between Paulin Modi and Mr. Reynolds, with payment occurring in 2009 and with Mr. Reynolds participating in the vote on the award of the township contract (which was in favor of Mr. Modi's company was in 2010. The indictment was in October 6, 2016. Thus, the charge is invalid under, and barred by, limitations as well outside of the five-year limitations period. 18 U.S.C. § 3282(a); *United States v Qayyum*, 451 F.3d 1214, 1218 (10th Cir. 2006); thus, the counts pertaining to the conspiracy and bribery between Mr. Modi  and Mr. Reynolds (Counts Twelve and Thirteen) should have been summarily dismissed.

---

11 *Id.*

38

The giving-of-value part of bribe took place in 2009, with the object, or "quid-pro-quo" part of the bribe (and the object of the conspiratorial agreement that was tantamount to the bribe) being the township's 2010 vote on the Giffels-Webster contract bid. That vote on the bid did, in fact, take place then, as anticipated. And Mr. Modi's Giffels-Webster was victorious. With that vitory ended the bribe and the conspiracy, both fully completed – the bribe complete in 2009 at the time of the exchange, and the conspiracy completed in 2010 at the time of the vote.

A conspiracy ends when the objective of the conspiracy has been achieved. *Krulewitch v United States*, 336 U.S. 440, 442 (1949). Therefore, the time to charge Mr. Reynolds ran out in 2015, a year before the Government actually did so. The statute of limitations cuts off that charge, and Mr. Reynolds is and has been actually, unequivocally, and categorically innocent of this charge since long before it was brough.

That there was evidence of another payment from Mr. Modi to Mr. Reynolds in 2013 has no bearing on this. It was unrelated in time and subject matter, and there was no legal or logical connection between that payment and any wrongdoing as charged in the stale indictment.

There was neither a promise to reciprocate nor any act of reciprocation and, thus, neither an *actus reus* to satisfy the necessary elements of both a bribery and a

39

conspiracy charge, nor an overt act to satisfy that necessary element of a conspiracy charge, as further discussed below. And courts are loath to recognize conspiracy charges spanning time periods outside of the statute of limitations of the substantive offense. *See, e.g., United States v Licciardi*, 30 F.3d 1127, 1133 (9th Cir. 1994).

This demonstrates another incident of fundamentally and profoundly ineffective assistance of counsel.[12]

## Sub-ground I

## Mistake of Law and Reliance on Counsel; *No Mens Rea*

Mistake of law and reliance on counsel are defenses to bribery. At the time of his acts, Mr. Reynolds was neither aware that his actions violated 18 U.S.C. § 18 or any other law at all. That is a specific intent crime, and failure to prove he had such knowledge at the time of the act is a complete defense. All bribery counts should have been challenged at the threshold and summarily dismissed.

Additionally, reliance on counsel causing the mistaken belief that unlawful acts are in the defendant's mind lawful on the advice of counsel is likewise a defense to charging statute. Beyond that, Mr. Reynolds is entitled to section 2255 relief where his counsel is tainted by conflict of interest for the simultaneous

_____

12 *Id.*

40

representation of the defendant and his co-defendant, and his counsel, Mr. Schwartz, so labored under such conflict by representing both Mr. Reynolds and his then-adversary, Mr. Rizzo, after he was "flipped to the government's side.". *United States v Culberhouse*, 507 F.3d 888 (5th Cir. 2007).

Finally, it is a defense to conspiracy charges under 18 U.S.C. § 371 that Mr. Reynolds lacked knowledge of pursuit of an unlawful end, No proof was adducced to demonstrate he was so knowledgeable. Thus, the conspiracy charges, likewise, should have been challenged at the threshold and summarily dismissed.

This demonstrates another incident of fundamentally and profoundly ineffective assistance of counsel.[13]

## Subground J

## No *Actus Reus*

As, noted above,  to the charge of the bribery of Mr. Reynolds by Mr. Modi surrounding the 2013 payment, there can be no criminal liability undelr 18 U.S.C. § 666 because of the lack of any act. Since any agreement in 2013 concerns an act that Mr. Reynolds had already performed (fourt years earlier, back in 2009), regardless of the lack of mens rea on Mr. Reynolds's party, there was no actus reus to safisfy a key element of criminal liability under a totality of the circumstances.

---

13  *Id.*

Therefore, this claim should have been immediately challenged and summarily disposed of at the threshhold of this criminal action.

> Although the timing of the payment may not provide a conclusive answer as to whether that payment is a bribe or a gratuity, the timing of the agreement to make or receive a payment may: one cannot agree to perform an act in exchange for payment when that act has already been performed. Therefore, if the agreement to exchange a think of value for an act is made after that act has been performed, that agrement cannot be properly viewed as an agreement to offer or accept a bribe.

*United States v Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013), aff'd, 790 F.3d 41 (2015), *aff'd sub nom. Bravo- Fernandez v United States*, 137 S.Ct. 352 (2016) (emphasis in original)(liability under 28 U.S.C.§ 666 for "bribe," but not for mere "gratuity").

Consequently, the bribery charge should have been  dismissed. And, as noted above, the charge against Mr. Reynolds for the 2009 bribery is barred by the statute of limitations, so that, likewise, should have been summarily dismissed. Therefore, none of the charges concerning Mr. Modi should have proceeded to trial.

This demonstrates another incident of fundamentally and profoundly ineffective assistance of counsel.[14]

---

14 *Id.*

## Sub-ground K

**Counsel's Failure or Refusal to Prepare Case Before Trial, Retain Expert Consultative and Testimonial Witnesses, Move to Strike Angelo Selva Testimony, Seek Psychological Examination of Angelo Selva, Call Any Witnesses at all, Make Necessary  Objections at Trial, Offer Documentary and Other Available, Relevant  Evidence Powerfully Exculpatory of Mr. Reynolds, Cross-Examine Government Witnesses, Permit Mr. Reynolds to Assist in His Own Defense, and Ultimate Pervasive Failure to Test Government's Case in Any Meaningful Way, Permeating and Tainting Entire Proceeding**

Counsel's Failure or Refusal to Prepare Case Before Trial, Retain Expert Consultative and Testimonial Witnesses, Move to Strike Angelo Selva Testimony, Seek Psychological Examination of Angelo Selva, Call Any Witnesses at all, Make Necessary  Objections at Trial, Offer Documentary and Other Available, Relevant Evidence Powerfully Exculpatory of Mr. Reynolds, Cross-Examine Government Witnesses, Permit Mr. Reynolds to Assist in His Own Defense, and Ultimate Pervasive Failure to Test Government's Case in Any Meaningful Way, Permeating and Tainting Entire Proceeding

The movant will be granted section 2255 relief where the government allegedly presented false testimony prosecution knew or should have known was false. *United States v Bibefeld*, 957 F.2d 98 (3rd Cir. 1992). Section 2255 relief is also warranted to determine whether counsel rendered ineffective assistance by failing to present a certain defense and failing to call witnesses on that defense. *Koskela v United States*, 235 F.3d 1148 (8th Cir. 2001).

43

The government presented testimony of Mr. Selva that it knew or should have known was false, either deceptively or innocently so, or some combination thereof. Further, as Mr. Selva was objectively veritably demented, he was not competent to testify. While he gave testimony of his medical conditions, he was not competent to give such testimony as any such testimony requires the witness, to be competent, to have the necessary medical expertise to diagnose, treat, and evaluation dementia, memory loss, cognitive inability, and lack of competency to give any evidence. Mr. Selva, for example, was permitted to give testimony without objection from Mr. Reynolds's counsel, concerning the connection between memory loss and diabetic neuropathy, even though such testimony is objectively verifiably false.

Further, Mr. Selva was permitted to testify, again without objection, that he was a former employee of Universal Training Co. (false), that he was Best Man at Mr. Reynolds's last wedding (false),  he identified Carlo as "Marco," testified without objection that Mr. Reynolds was working with Mr. Rizzo on an "extra contract," where no such thing ever existed. Further he testified that Brett Harris was not an official of New Haven Township when, in fact, Mr. Harris was. His testimony should have been barred in limine, or, at the very least, stricken and incompetent and inherently unreliable. Alternatively, Mr. Reynolds's counsel should have should, during the pretrial phase, a psychological examination to

diagnose Mr. Selva's dementia and report of the extent of his competency to testify. The allowance of, and failure to challenge, this unreliable testimony is another instance of defense counsel's effectively abdicating his advocacy obligation. This demonstrates another incident of fundamentally and profoundly ineffective assistance of counsel.[15]

13.     Mr. Reynolds has not previously presented in some federal court any of the grounds in this motion. His reason for not having presented them is that he is not an attorney, he has no training, education, or experience in the law, and he put his trust in, and reliance on, his trial counsel. His placing his trust and reliance on his trial counsel under the circumstances was reasonable.

14.     Mr. Reynolds has no motion, petition, or appeal now pending (filed and not decided yet) in any court for the judgment he is challenging.

15.     Stephen T. Rabaut, whose address is 16931 19 Mile Road, No. 100, Clinton Township, Michigan 48038, represented Mr. Reynolds at the preliminary hearing, arraignment and plea, and at the trial. Richard D. Korn, whose address is 645 Griswold, Suite 1717, Detroit, Michigan, 48226, represented Mr. Reynolds at sentencing and on appeal. There has been no ruling against Mr. Reynolds in a post-conviction proceeding; therefore, no appeal and no appellate attorney for that.

---

15 *Id.*

16.     Mr. Reynolds was sentenced on more than one count of an indictment in the same court at the same time but not on more than one indictment in the same court at the same time.

17.     Mr. Reynolds has no future sentence to serve after he completes the sentence for the judgment he is hereby challenging.

Therefore, Mr. Reynolds asks this Honorable Court to grant the following relief:

A.     Grant leave to take discovery;

B.     Grant leave to expand the record;

C.     Grant leave to file memoranda of law, briefs, and other court papers as this Honorable Court may deem necessary, appropriate, or permissive;

D.     Conduct an in-person evidentiary hearing before this Honorable Court, with leave specifically granted for Mr. Reynolds personally to appear before this Honorable Court, to be present in-person in the Courtroom of this Honorable Court, attired fully in street clothes, and so and there remain for the entirety of the hearing in order fully to assist counsel in the presentation of his cause and petitions to this Honorable Court at the hearing, and to meet and confer with his counsel separately, privately and in confidence, freely, at the opening, closing, and during such breaks in the proceedings for which this Court may allow, from time to time, strictly and solelef or the purposes of fully assisting his counsel and aiding in the

presentment of his own cause, as this Court deems necessary and appropriate in the premises, and further to be sworn and give testimony under oath, all at no cost to Mr. Reynolds, but, instead, with all expenses of travel, meals, lodging and other related expenses necessary and proper in connection with such arrangements to be born solely and entirely by the government;

E..     Set aside the judgment; and

F.      Immediately release and discharge Mr. Reynolds.

Respectfully submitted,

CRANBROOK LAW GROUP, P.C.

By  /s/ Barry R. Powers  (P40589)
38550 Garfield Road, Suite A
Clinton Township, Michigan 48038-3406
(248) 515-8599
Counsel for Defendant

DATED: November 16, 2021